## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

RICARDO JOSE RIVERA-ORTIZ,

      Plaintiff,

         v.

UNITED STATES OF AMERICA, et al.,

      Defendants.

**Civil No. 24-1533(GMM)**

## OPINION AND ORDER

Before the Court is the United States of America's ("United States") *Motion to Dismiss.* (Docket No. 13). For the following reasons, the Court **GRANTS** the United States' *Motion to Dismiss.*

### I. FACTUAL AND PROCEDURAL BACKGROUND

Two locations govern this case: La Perla, a neighborhood, and the Castillo San Felipe del Morro ("El Morro"), a historic fort within the San Juan National Historic Site. La Perla is a neighborhood located on the northern coast of the historic town of Old San Juan, Puerto Rico, just outside of the Old San Juan's iconic colonial walls, including those of El Morro and Castillo San Cristóbal. *See* (Docket No. 13 at 4). El Morro is a historic military fortress built between 1539 and 1790 by Spanish colonial authorities at the entrance to the Bay of San Juan. (Id. at 3). In 1949, the United States Secretary of the Interior named El Morro as a National Historic Site. (Id. at 5). In 1961, the United States

Department of the Army transferred El Morro and the surrounding area to the NPS. (Id.).

On February 22, 2024, the National Park Service ("NPS") received an administrative claim, via a Standard Form 95 ("SF-95"), from Plaintiff Ricardo José Rivera Ortiz ("Plaintiff" or "Rivera") seeking $24,650.00 in property damage, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.* (Docket Nos. 1-4; 13-1 at 1). Therein, Plaintiff claimed that, on December 8, 2023, at 4:00 a.m., his 2020 Mercedes-Benz A220 four-door sedan was stolen from Lucila Silva Street in La Perla, about twenty-five feet outside the historic wall of El Morro. (Docket No. 13-1 at 1-3; 13-2 ¶ 12). In his SF-95 claim, Plaintiff alleged that the NPS "breached its duty to keep [his] property safe because[,] despite of (sic.) the fact that the vehicle was located in a high[-]crime area[,] no patrols [were] performed by law enforcement in that area." (Id. at 3). Thus, he argued that NPS's negligence made it responsible for the theft because it had a duty to patrol the area, install warning signs, or otherwise implement "adequate security measures" to protect his property. (Id.). On September 9, 2024, the Department of the Interior's administrative forum, which oversees NPS, denied Rivera's claim, thus leading to the filing of this civil action. (Docket No. 1 at ¶9).

Civil No. 24-1533 (GMM)
Page - 3 -

On November 15, 2024, Plaintiff filed a pro se *Original Complaint* ("*Complaint*") against the United States under the FTCA. (Docket No. 1). Plaintiff presented the claims he first raised in the administrative forum: that on December 8, 2023, his car was stolen when he was visiting Lucila Silva Street in La Perla, which according to the Plaintiff, is less that twenty-five feet from the wall of El Morro. (<u>Id.</u> at 4).

Plaintiff posits that the San Juan National Historic Site in Puerto Rico ("SJNHS") management implemented an "illegitimate practice described as 'Zero Patrolling' and that "the failure of the federal law enforcement rangers to enforce federal and state law within [an] [NPS] site", specifically in or around the area outside the walls of El Morro, caused the theft of his vehicle. (<u>Id.</u> at 1-2). He adds that "[n]ot only the Plaintiff suffered a loss of property because NPS employees failed to provide warning notice signs about the dangers in the area; but because they also failed and/or refused to observe and supervise the area outside the wall of El Morro adequately." (<u>Id.</u> at 4). Plaintiff also claims that "NPS agents' failure to provide surveillance by camera for this particular area under these circumstances proximately (sic.) contributed to Mr. Rivera's loss of property.". (<u>Id.</u> at 6). Thus, Plaintiff argues that the NPS rangers' wrongful acts and omissions give rise to a count of negligence pursuant to the FTCA based on

Civil No. 24-1533 (GMM)
Page - 4 -

NPS's alleged failure to patrol, post warning signs, or conduct video surveillance. (Id. at 5-6).

On July 24, 2025, the United States filed a *Motion to Dismiss*. (Docket No. 13). Therein, it argues that "the actions and/or omissions of the NPS involve the exercise of discretionary conduct that implicate policy considerations." (Id. at 1-2) (emphasis omitted). Specifically, the United States alleges that "the applicable statutes, policies[,] and guidelines give the NPS discretion to decide how and when to patrol or monitor the different areas of the SJNHS and how and when to inform visitors of hazards." (Id.). Thus, the United States requests the dismissal of the *Complaint* for lack of subject matter jurisdiction, as the claims are barred by the discretionary function exception under the FTCA. (Id. at 2).

In support of the *Motion to Dismiss*, the United States submitted various documents, including the Puerto Rico Police Report prepared by Agent Miguel Rodríguez Sierra. (Docket No. 13-1 at 11). The report narrates that the Plaintiff informed the police that he was visiting La Perla and parked in front of La Garita Restaurant on Lucila Silva Street around 4:00 a.m. (Id.). Plaintiff further informed that he noticed one set of keys was missing and that when he returned to where his vehicle had been parked, it was no longer there. (Id.). The United States also

Civil No. 24-1533 (GMM)
Page - 5 -

submitted a sworn declaration under penalty of perjury of Ernest J. Padilla, Chief Ranger for the SJNHS, NPS ("Chief Ranger") affirming this account with photo evidence and also providing details about SJNHS's policy decisions regarding public safety measures. (Docket No. 13-2).

Following the incident, the United States asserts that NPS learned about the theft of Plaintiff's vehicle when he appeared two months later to notify officials at the SJNHS park on February 26, 2024. (Docket No. 13 at 7). An investigation of the incident followed; security camera footage from La Garita Restaurant, where Plaintiff's car had been parked, showed a masked individual attempting to open the car door of a metallic Mercedes Benz sedan at 4:13 a.m. and driving away with the vehicle at 4:16 a.m. (Id. at 7-8).

Furthermore, the United States refers to NPS's 2006 Management Policies to argue that these guidelines do not impose park-specific safety prescriptions; instead, they grant park superintendents and other decisionmakers with discretion to address all matters pertaining to public safety – including the installation of warning signs, patrolling or installing security cameras – while weighing the agency's objective to preserve historical settings and considering the Agency's available funds and staff. (Docket No. 13-2 at 8). The United States refers to NPS

Civil No. 24-1533 (GMM)
Page - 6 -

Director's Order 28 ("DO-28"), the NPS-28 Cultural Resource Management Guideline (the "NPS-28"), and the NPS Director's Order 50C ("DO-50C"), which supplement the NPS Management Policies, to further support its contention that park superintendents and managers have discretion to determine public safety measures, and that the NPS's main objective is the preservation of park resources, not visitors' property. (Id. at 16-19). Consequently, it contends that pursuant to the discretionary function exception the Court has no subject matter jurisdiction.

Assuming arguendo that the discretionary function exception does not bar this suit, the United States argues in the alternative that Plaintiff cannot prevail on a negligence claim because "the NPS did not owe Plaintiff a duty under Puerto Rico law to protect his personal property on a public street from third-party criminals," as Plaintiff admitted he was visiting La Perla and not the park, which was closed at 4:00 a.m. (Id. at 24-25). Neither can Rivera establish proximate causation, the Government argues, because "Plaintiff fails to plausibly plead that a patrolling schedule, video surveillance[,] or a warning sign would have effectively prevented the alleged theft." (Id.).

On August 12, 2025, Plaintiff filed *Plaintiff's Response to the United States' Motion to Dismiss* ("*Response*"). (Docket No. 16). In his *Response*, Plaintiff argues that the discretionary

Civil No. 24-1533 (GMM)
Page - 7 -

function exception does not apply because "there is no apparent rationale as to why 'a high crime area had non-existent patrolling'" and "'Defendant has not and cannot point to . . . evidence demonstrating that Park Officials did not involve[]safety considerations under an established policy.'" (Id. at 3). He adds that "[i]n this case, there can be no discretion involved by failing to uphold a sworn duty to protect life and property." (Id.). Plaintiff further supplements his argument with "the 1981 Memorandum of Agreement between the United States and the Commonwealth of Puerto Rico," which he argues "impose[s] mandatory duties on Defendant, as the parties agreed to exercise concurrent law enforcement jurisdiction within the boundaries of SJNHS." (Id. at 8). Plaintiff alleges that whether the NPS's policies as articulated in the Park Service Organic Act, the General Management Plan, the Management Policies Manual and the 1981 Memorandum of Agreement between the United States and the Commonwealth of Puerto Rico (the "Commonwealth") impose any specific and mandatory duties is an open question and it remains the United States's burden to establish that the exception applies. (Id. at 9). According to Plaintiff, "Defendant has not shown how not patrolling or failing to post any warning signs about proximity to a high-crime area - as applicable in the factual setting of this case - implicate any policy analysis." (Id. at 10). However, Plaintiff did not address

Civil No. 24-1533 (GMM)
Page - 8 -

the United States' arguments regarding the underlying negligence claim and lack of duty and proximate cause.

Thereafter, on August 27, 2025, Plaintiff filed a *Motion Submitting Agency's Statements in Support of Plaintiff's Opposition to Motion to Dismiss Filed at D.E. 16* where he asserted that he would not be able to submit the memorandum of understanding between the NPS and the Puerto Rico Police Department without the benefit of discovery. (Docket No. 19). However, in support of his Response he submitted a document entitled "Foundation Document San Juan National Historic Site Puerto Rico" dated September 2023. (Docket No. 19-1).

On September 22, 2025, the United States filed its *Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss*. (Docket No. 21). Therein, the United States responds that Plaintiff "has not put forward any evidence — nor even alleged — that the [NPS] has a specific and mandatory regulation or policy regarding the implementation of safety patrolling plans or the posting of warning signs in El Morro regarding criminal activity in the area" and that the "1981 Memorandum of Agreement is mum as to any of these particulars." (Id. at 2) (emphasis omitted). "The fact that the 1981 Memorandum states that the United States has concurrent law enforcement jurisdiction with the Commonwealth of Puerto Rico within the SJNHS," the United States argues, "does not tell us:

'in what manner, or, how?' these law enforcement efforts shall be implemented." (<u>Id.</u> at 3) (internal citations omitted).

Additionally, the United States posits that "Plaintiff mistakenly argues that Defendant has not shown that decisions about patrolling or posting warning signs implicate any policy analysis," as it is the Plaintiff's burden to rebut the presumption that a supervisor's discretionary acts are grounded in policy. (<u>Id.</u>). Further, it asserts the Plaintiff cites out of circuit caselaw that is inapposite to the facts of this case. (<u>Id.</u> at 5-7). Lastly, the United States contends that the Court should decline Plaintiff's invitation to apply Puerto Rico tort law principles because the discretionary function exception applies and bars any further inquiry. (<u>Id.</u> at 8).

On September 29, 2025, Plaintiff filed *Plaintiff's Brief in Support of his Response to the United States' Motion to Dismiss* reiterating his disagreement on the discretionary function exception, which the Court accepted as Plaintiff's sur-reply. (Docket Nos. 23; 25).

## II. LEGAL STANDARD

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by [the] Constitution and [federal] statute[,] which is not to be expanded by judicial decree." <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375,

377 (1994) (internal citations omitted). "It is to be presumed that a cause [of action] lies outside this limited jurisdiction[,] and the burden of establishing the contrary rests upon the party asserting jurisdiction." Id. (internal citations omitted). "Federal courts . . . therefore must be certain that they have explicit authority to decide a case"; otherwise, dismissal is warranted. Bonas v. Town of North Smithfield, 265 F.3d 69, 73 (1st Cir. 2011).

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) tests the legal sufficiency of Plaintiff's *Complaint*, rather than the merits of the claim. *See* Twum-Baah v. Dep't of Agric., 299 F. Supp. 3d 369, 372 (D.P.R. 2018).

A.    Fed. R. Civ. P. 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) constitutes a challenge to the Court's subject-matter jurisdiction over a claim. Valentín v. Hosp. Bella Vista, 254 F.3d 358, 362-63 (1st Cir. 2001). Subject-matter jurisdiction is "the [C]ourts' statutory or constitutional power to adjudicate the case." Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 89 (1998) (emphasis omitted); *see also* Wachovia Bank, N.A. v. Schmidt, 546 U.S. 303, 316 (2006) ("Subject-matter jurisdiction . . . concerns a court's competence to adjudicate a particular category of cases[.]").

Civil No. 24-1533 (GMM)
Page – 11 –

"[A] federal court may not hypothesize subject-matter jurisdiction for the purpose of deciding the merits." Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 577 (1999). "The requirement that jurisdiction be established as a threshold matter . . . is inflexible and without exception[,] for [j]urisdiction is power to declare the law, and [w]ithout jurisdiction the court cannot proceed at all in any cause[.]" Id. (citing Steel Co., 523 U.S. at 94-95) (internal citations omitted).

The First Circuit has described Federal Rule of Civil Procedure 12(b)(1) as a "large umbrella, overspreading a variety of different types of challenges to subject matter jurisdiction" — including standing, ripeness, mootness, the existence of a federal question, diversity of citizenship, and sovereign immunity. Valentín, 254 F.3d at 362-63. The party invoking the Court's subject matter jurisdiction bears the burden of proving that such a jurisdiction exists. See, e.g., McCulloch v. Vélez, 364 F.3d 1, 5 (1st Cir. 2004); Skwira v. United States, 344 F.3d 64, 71 (1st Cir. 2003); Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995).

The "pertinent inquiry is whether or not the challenged pleadings set forth allegations sufficient to demonstrate that the subject matter jurisdiction of the [C]ourt is proper." Marrero v. Costco Wholesale Corp., 52 F. Supp. 3d 437, 439 (D.P.R. 2014). In

Civil No. 24-1533 (GMM)
Page – 12 –

reviewing such a motion, the Court must construe the *Complaint* liberally and treat all well-pleaded facts as true, "according the plaintiff the benefit of all reasonable inferences." Murphy, 45 F.3d at 522.

In this inquiry, "the [C]ourt may consider documents outside the pleadings, such as exhibits and affidavits attached to the motion to dismiss, and the opposition." Mercado Arocho v. United States, 455 F. Supp. 2d 15, 17 (D.P.R. 2006); *see also* Land v. Dollar, 330 U.S. 731, 735 n.4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion, Judicial Code § 37, 28 U.S.C. § 80, Fed. R. Civ. P. 12 (b), the court may inquire, by affidavits or otherwise, into the facts as they exist."); *see also* Medina Grp., LLC v. Design Build, LLC, No. 23-CV-1160, 2024 WL 265891 (D.P.R. Jan. 24, 2024) (*quoting* Fernández-Molinary v. Industrias la Famosa, Inc., 203 F. Supp. 2d 111, 114-15 (D.P.R. 2002)).

### III. APPLICABLE LAW AND DISCUSSION

A.  Sovereign  Immunity,  FTCA,  and  Discretionary  Function
    Exception

The Court must first provide a brief overview of the doctrine of sovereign immunity, the FTCA, and the discretionary function exception. "As a sovereign, the United States is immune from suit unless it consents to being sued." Reyes-Colón v. United States, 974 F.3d 56, 58 (1st Cir. 2020). Where the United States has not

Civil No. 24-1533 (GMM)
Page - 13 -

consented to suit, "[f]ederal courts lack jurisdiction over tort actions against the United States." <u>Limone v. United States</u>, 579 F.3d 79, 88 (1st Cir. 2009). Through the FTCA, however, the United States has consented to suit in cases involving alleged injuries caused by government employees acting within the scope of their employment. 28 U.S.C. § 1346(b)(1).

The FTCA's limited waiver of the United States's sovereign immunity "must be construed strictly in favor of the federal government, and must not be enlarged beyond such boundaries as its language plainly requires." <u>Bolduc v. United States</u>, 402 F.3d 50, 56 (1st Cir. 2005) (citation modified). Congress nevertheless excepted several categories of claims from this waiver. If a claim falls within one of those exceptions, a federal court consequently will lack subject matter jurisdiction over the claim. See <u>Reyes-Colón</u>, 974 F.3d at 58 ("[A]s with many rules, exceptions exist. And if one is present, the government's immunity remains intact — so the district court will lack subject-matter jurisdiction over the tort claim.").

The discretionary function exception is one of those exceptions. It provides that the government does not consent to suit on: "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the

Civil No. 24-1533 (GMM)
Page - 14 -

Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

"In short, 'the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment.'" Torres-Estrada v. Cases, 88 F.4th 14, 21 (1st Cir. 2023) (quoting Berkovitz v. United States, 486 U.S. 531, 537 (1988)). A two-part analysis determines whether this exception applies. "'[Y]es' answers to both questions mean the discretionary-function exception holds sway and sovereign immunity blocks the litigation. But a 'no' answer to either question means the exception does not apply and the suit may continue." Mahon v. United States, 742 F.3d 11 at 14 (1st Cir. 2014).

The first prong of the analysis requires that the conduct must be properly described as discretionary — that is, the federal statute, regulation, or policy must not dictate the course of action of the federal employee such that he or she has no choice but to follow the directive. See Reyes-Colón, 974 F.3d at 58 (citing Mahon, 742 F.3d at 14). Instead, the statute, regulation, or policy must not require specific action and "the government actors in question must have latitude to make decisions and choose among alternative courses of action." Bolduc, 402 F.3d at 61.

Civil No. 24-1533 (GMM)
Page – 15 –

As to the <u>second prong</u>, if the conduct is discretionary, then the exercise or non-exercise of the employee's discretion must be actually or potentially affected by policy-driven considerations. <u>Reyes-Colón</u>, 974 F.3d at 59 (first *citing* <u>Evans v. United States</u>, 876 F.3d 375, 383 (1st Cir. 2017); and then *citing* <u>Mahon</u>, 742 F.3d at 12). The employee need not have "consciously engaged in any analysis of any policy considerations," but the exercise of discretion must be potentially affected by policy-related judgments. <u>Davallou v. United States</u>, 998 F.3d 502, 505 (1st Cir. 2021). Notably, "the discretionary function exception is not limited to high-level policymaking or planning functions. Rather, it can apply as well to day-to-day operational decisions." <u>Id.</u> at 505. The claimant bears the burden of rebutting the presumption that the discretionary act involves a policy judgment. <u>Evans</u>, 876 F.3d at 383.

As the First Circuit has recently reiterated in <u>Perales-Muñoz v. United States</u>, "the discretionary function exception bars any tort claim against the United States where a federal government employee, in relation to a tortious act, exercises some function or duty that potentially requires exercising some amount of policy discretion." 151 F.4th 1, 7 (1st Cir. 2025) (*citing* <u>Reyes-Colón</u>, 974 F.3d at 58-59). "This bar, however, does not apply when the 'harm-producing conduct itself is [not] discretionary' because a

Civil No. 24-1533 (GMM)
Page - 16 -

federal 'statute, regulation, or policy' . . . dictates 'a course of action' that the employee must follow." Id. at 4 (*quoting* Mahon, 742 F.3d 11 at 14). The discretionary function exception accordingly "does not immunize the government from liability for actions proscribed by federal statute or regulation." Limone, 579 F.3d at 101.

B.  NPS's Actions Fall Within the Discretionary Function Exception

At the center of Plaintiff's FTCA claims is NPS's alleged failure to establish a patrolling schedule, post warning signs, or conduct video surveillance outside the walls of El Morro, specifically in La Perla where Plaintiff's vehicle was stolen. (Docket No. 1 at 1-2). The United States argues that all matters pertaining to NPS's public safety measures at El Morro – including the installation of warning signs, patrolling, or installing security cameras, as Plaintiff lists - fall within the discretionary function exception because: (1) El Morro is managed consistent with NPS's Organic Act, NPS management policies, NPS DO-50C, and the NPS-28, all of which expressly leave public safety measure decisions to the discretion of NPS employees; and (2) the decision not to implement the measures Plaintiff puts forth was guided by NPS policy decisions about historical preservation and preservation of park resources and not visitor's property. (Docket No. 13 at 14-23).

Civil No. 24-1533 (GMM)
Page - 17 -

Plaintiff's main argument against application of the discretionary function exception fails.

First, the NPS documents Plaintiff leans on indicate that public safety measures are up to employee discretion. Consider the NPS Organic Act to start. It establishes that the NPS:

> [S]hall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

54 U.S.C. § 100101(a). The NPS Organic Act itself does not prescribe any specific conduct for NPS employees but simply states the general aim of the NPS's work.

In the same manner, certain NPS policies and guidelines implementing the NPS Organic Act specify that NPS's mandate is carried out at the discretion of NPS employees. Take the 2006 NPS Management Policies. In pertinent part, it states that "[t]he preservation of cultural resources in their existing states will always receive first consideration." (Docket No. 13-2 at 37). Furthermore, they clearly state that the NPS strives to protect human life and provide injury-free visits, and "will do this within . . . [t]he primary—and very substantial—constraint imposed by the Organic Act. . . [and] that discretionary management activities

may be undertaken only to the extent that they will not impair park resources and values." (Id. at 39). Moreover, Section 8.2.5.1 on "Visitor Safety" establishes the following:

> Park visitors must assume a substantial degree of risk and responsibility for their own safety when visiting areas that are managed and maintained as natural, cultural, or recreational environments.
>
> These management policies do not impose park-specific visitor safety prescriptions. **The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing. Examples include decisions about whether to install warning signs** or artificial lighting, distribute weather warning or advisories, initiate search-and-rescue operations or render emergency aid, eliminate potentially dangerous animals, close roads and trails or install guardrails and fences, and grant or deny backcountry or climbing permits. Some forms of visitor safeguards typically found in other public venues such as fences, railings, and paved walking surfaces may not be appropriate or practicable in a national park setting.

(Id.) (emphasis added). As to signage, in pertinent part Section 9.3.1.1 on "Signs" states:

> Signs will be carefully planned and designed to fulfill their important roles of conveying an appropriate NPS and park image and providing information and orientation to visitors.
>
> [. . .]
>
> Signs will be held to the minimum number, size, and wording required to serve their intended functions and to minimally intrude upon the natural and historic settings.

Civil No. 24-1533 (GMM)
Page – 19 –

(Id. at 41). In other words, the policies leave the choice to implement and place signs to NPS employees to decide alongside aesthetic considerations.

Same with the NPS-28 guidelines. The NPS-28 establishes that park superintendents and managers have discretion in the management of resources and implementation of measures that affect cultural resources. (Id. at 25). Regarding security measures it specifically defers to the "careful consideration" of employees:

> Providing for the physical security of cultural resources is an essential part of their stewardship. Prevention, the best form of protection, is the focus of an effective park crime prevention and physical security plan. In developing such plans and implementing designs, sensitivity to cultural and natural museum property, historic materials, character, and setting is vital. **The installation of alarms, locks, fencing, and other security devices in archeological sites, cultural landscapes, and historic structures should follow careful consideration of their physical and visual impacts** in consultation with historical architects, historical landscape architects, archeologists, and curators as appropriate.

(Id. at 29) (emphasis added).

In the same manner, the DO-50C explains that NPS Superintendents "must make discretionary decisions that balance public recreation and safety with preservation of the protected natural, historic, or cultural setting." (Id. at 43). The DO-50C adds that NPS Superintendents "will use their discretion to determine the level of program resources and the types of programs needed to manage visitor risk within their park." (Id. at 52).

Civil No. 24-1533 (GMM)
Page - 20 -

"The means by which public safety concerns are to be addressed in each park falls under the discretion of the park's superintendent." (Id. at 43). As to the superintendent's discretion it specifically adds that it "will depend on the resources, values, park-specific mission, feasibility of various program levels, activities offered at the park, nature of the park visits, degree of risks to visitors at the park, the history of visitor injury in the park, and available resources." (Id. at 52).

Additionally, the SJNHS in San Juan's *Superintendent's Compendium of Designations, Closures, Permit Requirements and Other Restrictions Imposed Under Discretionary Authority*, dated May 18, 2023, states that "[p]ublic use of the forts is restricted to the hours of 9:00 a.m. through 5:00 p.m." and that the "[h]istoric city walls and adjoining areas are generally available for the public enjoyment" but "[t]he park is not responsible for injury, theft or accidents." (Id. at 11-12). As to video surveillance, SJNHS states that:

> [t]he park's use of Closed-Circuit Television (CCTV) for law enforcement and security purposes will only be to visually monitor public park areas and public activities where no constitutionally protected reasonable expectation of privacy exists. Such CCTV use – which will have adequate privacy and First Amendment safeguards – will be to help ensure public safety and security; facilitate the detection, investigation, prevention, and deterrence of terrorist attack and crime; help ensure the safety of citizens and officers; help assist in the proper allocation and deployment of law enforcement and public safety resources; and help

Civil No. 24-1533 (GMM)
Page - 21 -

     facilitate the protection of the innocent and the
     apprehension and prosecution of criminals.

(Docket No. 13-2 at 11)

According to the policies and guidelines previously
highlighted, no statutes or regulations impose a duty on the United
States to install security cameras, always patrol the outside of
El Morro, or to protect the property of individuals who visit the
nearby area after it is closed. Likewise, no federal law,
regulation, or policy establishes the manner in which the NPS's
law enforcement efforts should address or warn visitors about the
criminal activity outside the walls or in the surrounding areas of
El Morro. Thus, NPS employees' actions are discretionary per the
first prong of the analysis.

As to the second prong, the Court examines whether the
exercise or non-exercise of the employees' discretion was actually
or potentially affected by policy-driven considerations. Here, the
discretion of NPS employees in addressing safety and security
matters is engrained in the public policy concerns of the NPS in
relation to its mission of preserving the historical and
architectural integrity of El Morro and the use of the agency's
resources to meet those goals. Particularly, the policies,
guidelines, and the declaration from the Chief Ranger show that
the main objective of the security measures taken at El Morro is
the preservation of the historic grounds and the park's site

Civil No. 24-1533 (GMM)
Page – 22 –

resources. The methods chosen to maintain El Morro and the decisions to invest funds and time to patrolling lower-usage areas and areas outside the historic walls, installing security cameras, and monitoring the video footage of those cameras, involve choices that are discretionary to management.

Each of the three security methods Plaintiff raises were discretionary decisions driven by policy considerations. As to patrolling, the Chief Ranger declared that "[s]taffing and budget limitations affect the frequency with which the Park's rangers can patrol the different areas of the SJNHS." (Id. at 8 ¶37). Relevant here, "[w]ith respect to prong two of the discretionary function exception," courts have also found that "the patrolling of the [park] is 'susceptible to policy analysis.'" Quigley v. United States, 927 F. Supp. 2d 213, 220 (D. Md. 2012) (citing United States v. Gaubert, 499 U.S. 315, 325 (1991)). See also Barbour v. United States, No. 18-CV-00246, 2024 WL 3011493, at *6 (E.D. Cal. June 12, 2024) ("The discretionary decision to patrol elsewhere in the courtyard to maintain internal security, rather than to monitor the metal detectors or investigate the metal detector alarm, is the type of action protected by the discretionary function exception.").

Moreover, as to video surveillance, the Chief Ranger also declared that "[s]taffing and budget limitations also impact the

Civil No. 24-1533 (GMM)
Page - 23 -

security equipment, such as Closed-Circuit Television (CCTV)
security cameras, that can be installed and monitored in the Park."
(Docket No. 13-2 at 9 ¶ 38). Likewise, the decision whether to
install warning signs is also considered susceptible to public
policy analysis. The Chief Ranger also states that consistent with
its policies the NPS can "choose to minimize the amount of signage
within the SJNHS, so as not to detract from the cultural impact or
aesthetics of the historic location." (Id. at 8 ¶32).

Thus, the balancing between safety and aesthetics involved in
placing signs or cameras in historical and cultural areas are
matters of policy. *See generally* Valdez v. United States, 657 Fed.
App'x 3, 6 (1st Cir. 2016) (affirming the placement of signs in a
Puerto Rico national park is a matter of policy that falls under
the discretionary function exception).

La Perla, and specifically the street where Plaintiff's car
was stolen, is near the walls of El Morro but outside of the SJNHS,
and the decision not to establish security measures that extend
beyond the walls was rooted in policy decisions to preserve El
Morro as a historic and cultural site. *See* (Docket No. 13-2 at 1-
9); (id. at 37) ("The preservation of cultural resources in their
existing states will always receive first consideration."). The
record reflects that patrol operations within the boundaries of
SJNHS — including areas such as La Perla — are contingent upon

Civil No. 24-1533 (GMM)
Page - 24 -

available staffing levels, operational budgets, and mission priorities. Such staffing occurs during park operating hours, when visitor use is highest, and not at 4:00 a.m., when Plaintiff's car was stolen.

Notwithstanding, Plaintiff argues – relying entirely on out-of-circuit case law – that the discretionary function exception should not apply when a safety consideration is at issue. However, the cases he cites are neither binding on this Court nor factually analogous to this case. *See* (Docket No. 16 at 8-16) (first *citing* Whisnant v. United States, 400 F.3d 1177 (9th Cir. 2005); then *citing* O'Toole v. United States, 295 F.3d 1029, 1033 (9th Cir. 2002). Ninth Circuit cases on which Plaintiff relies address factual scenarios where there were no public policy considerations relevant to the unsafe conditions at issue. *See* id. The United States, on the other hand, provides binding authority to support the position that when competing safety and public policy considerations exist, it is within the discretion of the government employee to ground his or her decision in public policy concerns for conservation and preservation. *See* (Docket No. 13 at 11, 21-22) (first *citing* Andújar-López v. United States, No. 24-CV-1397, 2025 WL 1433385, at *5 (D.P.R. May 19, 2025) (dismissing an FTCA claim for alleged lack of maintenance at El Morro); and then *citing* Cassagnol-Figueroa v. United States, 755 F. Supp. 514, 523 (D.P.R.

Civil No. 24-1533 (GMM)
Page - 25 -

1991)(dismissing a FTCA claim for a slip and fall at El Morro).
When, as here, the Government employee's decision is discretionary
and grounded in such public policy, any possible liability for
negligence is shielded under the FTCA's discretionary function
exception.

Additionally, Plaintiff provides no evidence to rebut the
United States's showing that the discretionary acts of NPS
employees were grounded in policy. Plaintiff only relies on the
1981 *Memorandum of Agreement* between the United States and the
Commonwealth. *See* (Docket No. 13-2 at 7 ¶21; 13-15). A review of
this agreement reveals that "all the lands within the exterior
boundaries of the [SJNHS]" are subject to the concurrent
jurisdiction merely for collaborative law enforcement purposes.
(Id. at 14). The agreement clarifies that "the management of the
natural and historic resources within the Site and the
administration and operation of said Site shall remain under the
exclusive control of the United States of America and that the
regulations of the National Park Service, except as otherwise
provided herein, shall be exclusive in the management and operation
of said Site." (Id.). In addition, the agreement states that

> the police and law enforcement resources of each will
> effect the maximum degree of cooperation in order that
> historic resources of the Site and the visitors to the
> Site will be protected and that such cooperation will
> include, but not be limited to, problems with traffic
> control, criminal activity, both felonies and

Civil No. 24-1533 (GMM)
Page – 26 –

misdemeanors, and such other activity as may be mutually
determined to be in the interest of the parties.

(Id. at 15). In other words, nothing in this agreement can be
construed as establishing or imposing a mandatory duty on the SJNHS
to install cameras, warning signs or institute patrolling in La
Perla area that is near the walls of El Morro. On the contrary,
the very agreement includes language that makes clear that the
SJNHS and NPS will retain exclusive control of management and
operations, which include the implementation of security and
safety measures. The fact that the 1981 Memorandum states that the
United States has concurrent law enforcement jurisdiction with the
Commonwealth within the SJNHS boundaries does not mean it directed
the SJNHS to implement specific law enforcement measures nor does
it instruct in what manner it was to provide such law enforcement.

Thus, Plaintiff's reference to the 1981 Memorandum not only
does not establish liability but is insufficient to satisfy
Plaintiff's burden of rebutting the presumption – upheld by
evidence provided by the United States – that the NPS's
discretionary acts involve a policy judgment.

More importantly, Plaintiff claims under the FTCA that the
United States is liable to him for the theft of his vehicle, which
he parked at La Perla — again, outside the walls of El Morro — at
approximately 4:00 a.m., because the NPS owed him a duty to keep
his property safe from a high crime area. Importantly, "[a]lthough

Civil No. 24-1533 (GMM)
Page - 27 -

law enforcement agents have a mandatory duty to enforce the law, decisions as to how best to fulfill that duty are protected by the discretionary function exception to the FTCA." Nogueras-Cartagena v. United States, 172 F. Supp. 2d 296, 318 (D.P.R. 2001), *aff'd sub nom.* Nogueras-Cartagena v. U.S. Dep't of J., 75 Fed. App'x 795 (1st Cir. 2003) (*quoting* Horta v. Sullivan, 4 F.3d 2, 21 (1st Cir. 1993)). Moreover, "[s]ince decisions to investigate, or not, are at the core of law enforcement activity," said conduct is the type of "policy-rooted decision making that section 2680(a) was designed to safeguard." Kelly v. United States, 924 F.2d 355, 362 (1st Cir.1991). Thus, the discretionary function exception also bars Plaintiff's claim insofar as it is based on a failure to protect Plaintiff from being harmed by a third party — in this case the thief that stole his car. Here, although NPS law enforcement routinely patrols El Morro and its surrounding areas, due to available staffing, operational budgets, mission priorities, they decided not to implement additional security measures to extend beyond the historic walls and beyond the operating hours of the park. The decisions of law enforcement agencies about whether and how best to protect members of the public from the criminal activity of third parties are immunized under Section 2680(a). *See, e.g.,* Bergmann v. United States, 689 F.2d 789, 793 (8th Cir. 1982). Questions regarding how much

Civil No. 24-1533 (GMM)
Page – 28 –

security, and what type of security, is necessary to protect the public from crimes committed by third parties have repeatedly been held to involve the discretionary function exception. *See generally* Hughes v. United States, 110 F.3d 765 (11th Cir. 1997); Fazi v. United States, 935 F.2d 535 (2d Cir. 1991); Fanoele v. United States, 975 F. Supp. 1394 (D. Kan. 1997); Leslie v. United States, 986 F. Supp. 900, 905–06 (D.N.J. 1997); Higgins v. United States, 894 F. Supp. 232 (M.D.N.C. 1995).

In sum, the NPS's choices regarding the timing and scope of patrols and video surveillance across various areas of El Morro and beyond its walls, as well as how and when to alert visitors to potential hazards like criminal activity are clearly grounded on public policy concerns for conservation and preservation and allocation of the agency's resources. Thus, these decisions are protected under the discretionary function exception and the sovereign immunity doctrines guards the United States from suit.

Therefore, Plaintiff's claims for damages under the FTCA must be dismissed without prejudice for lack of subject matter jurisdiction. As a result, the Court need not reach the merits of Plaintiff's negligence claim under Puerto Rico law. *See* Acevedo Vives v. United States, No. CV 20-1580 (JAG), 2023 WL 8190860, at *1 (D.P.R. Nov. 27, 2023)) (*citing* Rakes v. United States, 442 F.3d 7, 18-19 (1st Cir. 2006)).

Civil No. 24-1533 (GMM)
Page – 29 –

## IV. CONCLUSION

The Plaintiff's claims against the United States are barred by sovereign immunity under the discretionary function exception. For that reason, the *Complaint* must be dismissed. Accordingly, and for the reasons stated above the Court **GRANTS** the *Motion to Dismiss* for lack of subject-matter jurisdiction and Plaintiff's claims are DISMISSED WITHOUT PREJUDICE. Judgment shall be entered accordingly.


IT IS SO ORDERED.

In San Juan, Puerto Rico, on December 17, 2025.




s/Gina R. Méndez-Miró
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE